UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOSE E. SILVA, | Case No. 2:17-cv-02149-APG-DJA |
| Petitioner, | |
| v. | ORDER |
| BRIAN WILLIAMS, SR., et al., | |
| Respondents. | |

Petitioner Jose E. Silva filed a counseled second amended petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 19.  I deny Silva's habeas petition.

*Background[1]*

Ground 2 is the sole ground remaining for decision.  Silva alleges his appellate counsel's failure to challenge the state district court's denial of his motion to suppress evidence constitutes ineffective assistance of counsel. ECF No. 19 at 18–23.

A. Investigation

Las Vegas Metropolitan Police Department (Metro) Officer Palo De Leon testified that on September 29, 2008, Silva filled out a "Suspect Voluntary Statement" in which he admitted

---

[1] I make no credibility findings or other factual findings regarding the truth of evidence or statements in the state court.  I summarize them solely as background to the issues presented in this case and I do not summarize all such material.  No assertion of fact made in describing information from the state court constitutes a finding by me.  The lack of a mention of any evidence in this overview does not signify that I have overlooked the evidence.

Since Ground 2 of the petition concerns ineffective assistance of appellate counsel, the summary of background facts is based on the state appellate record, including the pleadings filed in connection with Petitioner's motions to suppress evidence in the trial court, and testimony at the preliminary hearing and trial. *See United States v. Sanford,* 673 F.2d 1070, 1072 (9th Cir.1982) ("[T]estimony at trial may be used to sustain the denial of a motion to suppress evidence, even if such testimony was not given at the suppression hearing.") (citing *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

1

making fraudulent purchases using Green Dot prepaid cards and a fake ID.[2] Silva told De Leon he demagnetized the magnetic strips on Green Dot prepaid cards (so the cards would fail when swiped) and affixed American Express credit card numbers to the cards. Silva told De Leon that when swiping failed to authorize his purchase, he had the cashier enter the American Express card number into the store's credit card machine to obtain authorization. Silva told De Leon he knew American Express does not issue Green Dot prepaid cards.[3] ECF No. 9-31 at 73–81.

Rhodora Cheava, a sales associate at the Venezia jewelry store at the Venetian hotel in Las Vegas, Nevada, testified that on October 28 2008, Silva purchased a $1,540 watch from her using a Green Dot prepaid Mastercard® depicting an American Express credit card account number and an ID depicting Silva's photo and the name Rich Meek.[4] When swiping failed to authorize the sale, Cheava (ignoring her co-worker Dolores Nicoletti's concerns about the card's authenticity[5]) obtained authorization by manually entering the American Express card number into the credit card machine. ECF No. 9-27 at 4–20, 65–70.

---

[2] According to the District Attorney's pleadings in this case, Silva was previously arrested on August 2, 2008, for fraudulently using a credit card, but released when charges were not filed. He was again arrested for fraudulent credit card charges on September 29, 2008, and spoke with De Leon, but charges were again not filed, and Silva was released from custody on October 1, 2008. ECF No. 27-22 at 3.

[3] De Leon's testimony was admitted for the limited purpose of proving intent, motive, knowledge or absence of mistake or accident. ECF No. 9-31 at 76–77.

[4] American Express security investigator, Christi Holley, testified Mastercard® credit cards have 16 digits while American Express credit cards have only 15 digits. ECF No. 9-27 at 92–95. Kristi Smith, a Green Dot risk and processing operations manager, testified Green Dot prepaid cards are affiliated with Mastercard® or Visa, but not American Express. ECF Nos. 9-27 at 97–99; 9–30 at 52–58. Smith testified Green Dot cards are sold at retailers, such as Wal-Mart, and must first be activated by the retailer in exchange for an activation fee and a load amount, before a plastic card is mailed to the customer, after which the customer may reload the card with additional funds. ECF No. 9-30 at 54–57.

[5] Nicoletti did not like the way the card looked as it was cardboard. ECF No. 9-27 at 68–69, 71.

On November 2, 2008, Silva, posing as Meek, returned to Venezia and purchased a $5,800 watch using the same ID for Meek and two Green Dot prepaid Mastercards® bearing American Express credit card account numbers.[6] Cheava recognized Silva (as Meek); ignored a second coworker's concerns about the card's legitimacy;[7] and obtained authorization by entering the American Express card numbers into the card machine. The coworker, Sharon Lynn, told her manager, Brenda Gullo, about the dubious card the next day. ECF No. 9-27 at 21–28, 74–80.

On November 13, 2008, Gullo confirmed Silva's purchases (as Meek) were fraudulent after contacting Christi Holley at American Express in response to a request for documents supporting the purchases. ECF No. 9-27 at 99–111, 125–126, 141–145, 156–157.

Holley was simultaneously investigating fraudulent American Express credit card claims for purchases at the Tahiti Village Resort in Las Vegas, Nevada. ECF No. 9-27 at 112, 113–117. Lealiza Buenafe testified she was the front desk agent at the resort on November 10, 2008, when Silva (as Rich Meek) registered for three nights at the Tahiti Village Resort. Buenafe testified she recognized Silva as the man who registered as Meek, and remembered him because she was a new employee, he had a little girl with him, and he had a difficult time processing a Green Dot prepaid card as a security deposit. ECF No. 9-31 at 66–68.

The resort's front office supervisor, Brittney Larrick, testified that on November 13, 2008, the hotel received a phone call to extend the stay in the room registered to Meek for another night. ECF No. 9-31 at 51–61. American Express investigator Holley testified the resort sought credit card authorization for the additional night, but American Express declined all attempted charges. ECF No. 9-27 at 115–117.

Silva submitted declarations signed under the penalty of perjury in support of his motions to suppress evidence in which he stated the resort manager, Michael Mayhew, called him about

---

[6] The American Express credit card account holder, Mark Engle, testified the November 2, 2008 purchase was fraudulent. ECF No. 9-27 at 130–32.

[7] Lynn warned Cheava the card did not "look quite right" because it "wasn't a credit card," but a "jacket of a credit card." ECF No. 9-27 at 78–79.

the credit card problem around 5:50 p.m. and Silva informed him that he was "no longer staying at the hotel, and that room 1501 is not the room he checked into." ECF Nos. 20-6 at 3–4; 20-7 at 3–5. Mayhew testified the registrant for room 1501 was Rich Meek but the true American Express credit card account holder, Daniel Eppink, informed him the room charges attributed to Meek were fraudulent.[8] ECF No. 9-30 at 11–13. After Mayhew confirmed the charges were fraudulent, and not knowing who occupied the room, he resolved to evict the occupants, and called Metro. ECF No. 9-30 at 12–14.

Metro Officer Ronald Thoma and trainee Officer John Campbell testified they responded to the call from the resort.[9] ECF Nos. 9-4 at 9; 9-30 at 66–69. Campbell testified that resort security showed police the registration receipt for the room depicting the registrant's name and the first 12 digits for the credit card used to register the room and documents demonstrating the credit card number used to register the room belonged to a different man. ECF No. 9-4 at 10. The resort manager told Campbell he wanted to "take back the room," "find out who was in the room" and "get the people out of the room who were in since they weren't lawfully there. They didn't pay for the room." ECF No. 9-4 at 9. The manager, security, and the officers, went to the room door. ECF Nos. 9-4 at 9–10; 9-30 at 14, 68–69. They knocked and announced their arrival, but no one answered the door. ECF Nos. 9-4 at 9; 9-30 at 14, 25, 68–69. Campbell said the manager "was pretty adamant about getting people out of the room," and after knocking for "about 10 minutes at least" and attempting to open the door using a master key, he could not open the door.[10] ECF No. 9-4 at 9.

---

[8] Metro financial crime detective Matthew Downing testified the cardholder also reported the fraud to Metro. ECF No. 9-30 at 117, 119.

[9] Campbell testified at the preliminary hearing while Thoma testified at trial.

[10] Thoma testified they knocked for about a minute and a half. ECF No. 9-30 at 69. The record does not indicate whether Campbell and Thoma arrived at the door at separate times.

4

Thoma and Campbell each testified they informed the resort manager they were leaving as they could do nothing at that time and told the manager to call them back if he contacted anyone inside the room. ECF Nos. 9-4 at 9; 9-30 at 70. The officers walked to the elevator to leave, but the manager asked the officers to wait so they could try a different key and take possession of the room. ECF Nos. 9-4 at 9; 9-30 at 70. According to Campbell, the manager said the resort was taking "back this room" since "[n]obody's paid for the room" and "[i]t's our room." ECF No. 9-4 at 9.

Campbell, and Thoma each testified Mayhew asked police to "stand by" for security reasons.[11] According to Campbell, when the manager finally unlocked the room door after trying a third master key, the officers stood at the door and peered inside the room. ECF No. 9-4 at 10. Campbell testified he asked security whether the room looked normal, and security responded, "it looks like nobody's even been in there" and it looked like nothing had been disturbed. ECF No. 9-4 at 10. Thoma testified "management went in," while he and Campbell "stayed at the door." ECF No. 9-30 at 71. According to Thoma, "[m]anagement went to the back balcony and started saying, '[h]ey you guys, come out. Come out. Come out," and then Thoma and Campbell saw four people on the balcony. ECF No. 9-30 at 71. Knowing the room was rented with a stolen credit card, the officers then went inside the room to make sure there were no weapons.[12] ECF No. 9-30 at 71. As the officers approached the balcony, Campbell testified they saw the following in plain view: "small knives," a handwritten document bearing 16-digit

---

[11] Campbell testified the resort manager asked police "just to stand by to make sure that if anything happened – it was just him and a security officer and unknown people in the room. He just asked us to stand by." ECF No. 9-4 at 10. Thoma testified he believed his role was to "standby as management went inside" "for safety reasons," and "if there was an issue inside the room, if there were people in there and they needed assistance," the officers "would go in to assist them, stand by for keeping the peace or protect them." ECF No. 9-30 at 70.

[12] Campbell testified police "couldn't see anything from the entrance that led to us believe that anyone was even in the room," and they went inside to make sure and found four individuals on the balcony. ECF No. 9-4 at 10. Mayhew testified, he "entered [the room] with police, followed by hotel security, and found certain individuals in the room. ECF No. 9-30 at 14–15, 30–31.

numbers that appeared to be credit card numbers, and a computer depicting an IP address. ECF No. 9-4 at 10, 11. Since a fraudulent credit card was used to procure the room, Campbell believed those items looked like evidence of a crime. ECF No. 9-4 at 10. According to Thoma, as they approached the balcony, the officers looked in the immediate area to ensure the individuals were not holding weapons and that no weapons were accessible. ECF No. 9-30 at 74. Thoma noticed a weapon on the table on the balcony, "perceived that as a threat," and handcuffed all four suspects. ECF No. 9-30 at 75–76.

Thoma testified he shone his flashlight to the parking area below the balcony to see if any things were thrown because, "obviously they could hear us knocking on the door." ECF No. 9-30 at 76. Thoma asked security to investigate an item that reflected off his flashlight. ECF No. 9-30 at 76–77. Hotel security officer Samuel Huicochea retrieved the item from the parking area below the balcony, which turned out to be a purported California driver's license bearing Silva's photo and the name Rich S. Meek. ECF No. 9-30 at 40, 47, 76–78. Thoma testified he noticed the ID picture looked like Silva and pointed it out to Silva because Silva had told him his name was Jose Silva; but Silva denied his photo was on the license. ECF No. 9-30 at 77–78, 80, 84.

The officers testified they escorted the individuals to the hallway, froze the premises, and contacted fraud detail. ECF Nos. 9-4 at 10, 11; 9-30 at 78–79. According to Thoma, the officers "didn't touch anything" and did not "search anything" except to open a closet door to ensure no one was hiding inside it. ECF No. 9-30 at 79–82. According to Campbell, they awaited the arrival of other officers and a search warrant and secured the room by posting a sign on the door, so nothing was disturbed. ECF No. 9-4 at 10. Campbell said they monitored the four individuals in the hall until a third officer arrived and took over monitoring the room door, and then he and Thoma escorted the four suspects to a hotel office to continue to wait.[13] ECF No. 9-4 at 10–11.

---

[13] Thoma testified they moved the four individuals because it was "too crowded" in the hallway with other guests walking past them. ECF No. 9-30 at 79.

6

Detective Downing of the Metro Financial Crimes Division testified he obtained the room registrant's name (Rich Meek) and the credit card number used to register the room upon his arrival at the scene. ECF Nos. 9-4 at 12; 9-30 at 116–118. Downing said someone (he did not recall who) handed him a document bearing credit card numbers, and a California driver's license bearing the name Rich S. Meek. ECF No. 9-4 at 12, 15. Downing testified the license depicted Silva's photo and was obviously fraudulent. ECF No. 9-4 at 13. Downing obtained a telephonic search warrant and police seized (1) Green Dot Mastercard® cards (some with American Express credit card account numbers affixed); (2) gift cards; (3) a P-touch laser label printer; (4) strips of labels bearing what appeared to be credit card numbers; (5) documents bearing credit card numbers (including the number used to register the room), security codes, and expiration dates; (6) a laptop,; and (7) a check endorsed to Meek. ECF Nos. 9-4 at 12–13, 15, 16; 9-30 at 117–122; 9-31 at 2–7, 9–11, 16.[14]

On November 30, 2008, Silva, still posing as Meek, called Cheava and made an appointment to purchase another item at Venezia. ECF No. 9-27 at 29–30, 80–81. Anticipating Silva's attempt to make another fraudulent purchase, Gullo contacted Holley at American Express who, in turn, advised the store to contact Detective Downing upon Silva's arrival at the store. ECF Nos. 9-27 at 30–31, 79–83, 117–118, 146–147; 9-31 at 14.

On December 1, 2008, Silva attempted to fraudulently purchase a $7,000 bracelet at Venezia by, once again, presenting Cheava with a Green Dot Mastercard® bearing an American Express credit card account number. ECF No. 9-27 at 31– 36, 39–41, 84–85. The store required photo ID to complete the purchase, but police previously confiscated Silva's fake ID for Meek when they arrested him at the resort, so Silva told Cheava he left his ID in the car and asked her to use the copy of the ID she made for his prior purchases. ECF No. 9-27 at 34–35. Cheava refused because she could not complete the transaction without an ID and did not keep copies of

---

[14] According to the District Attorney's pleadings, Silva was arrested on November 13, 2008, for the fraudulent room rental at the Tahiti Village, but charges were not filed by the 72-hour hearing deadline, so Silva was released from custody on November 17 or 18, 2008. ECF No. 27-22 at 3.

7

IDs at the store location. ECF No. 9-27 at 34–35.  Meanwhile, Downing was summoned, and he arrested Silva upon arrival. ECF Nos. 9-27 at 36; 9-31 at 13–15, 17.  Downing testified he found Green Dot cards and Silva's Nevada ID on Silva's person. ECF No. 9-31 at 19–21.  Jorge Pantoja testified Silva had hitched a ride to Venezia from him earlier that day and planned to leave the same way. ECF No. 9-30 at 97–98.  Pantoja testified he consented to Downing's search of his van. ECF Nos. 9-30 at 95–96; 9-31 at 18–19.  Downing testified he found a grocery bag between the front seats in the van, its contents in plain view, including Green Dot cards, a label maker, and tickets bearing Silva's name. ECF Nos. 9-30 at 96; 9-31 at 19–20.

Downing testified Silva agreed to speak with him after he was informed of his *Miranda* rights. ECF No. 9-31 at 29–30.  In his recorded interview, Silva confessed ownership of the contents in the bag found in the vehicle and confessed to using a fake ID and fraudulent Green Dot card at the resort.[15] ECF Nos. 9-31 at 54; 27-22 at 13–14.

Venezia provided video surveillance tapes for all three of Silva's visits to Venezia. ECF Nos. 9-27 at 146–155; 9-31 at 26–27.

B.  Trial court proceedings

The State ultimately[16] charged Silva with (1) four counts of burglary; (2) two counts of theft; (3) three counts of fraudulent use of a credit or debit card; (4) two counts of possession of credit or debit card without cardholder's consent; (5) one count of attempted theft; and (6) one count of attempted fraudulent use of a credit or debit card.[17] ECF Nos. 9-26 at 1–8; 9-28 2–10.

---

[15] The recorded interview, but not the written transcription, was admitted into evidence at trial. ECF Nos. 9-30 at 109–113; 9-31 at 29–33.

[16] According to the District Attorney's pleadings in this case, charges for the Tahiti Village crimes were consolidated with the Venezia crimes following Siliva's arrest on December 1, 2008. ECF No. 27-22 at 3.  The State eventually filed a third amended information before jury selection. ECF No. 9-28 at 4–10.  In it, the State also noticed intent to seek habitual criminal status. ECF No. 9-26.

[17] Counts 8, 9, and 10 concerned fraudulent transactions at the Tahiti Village Resort. ECF No. 9-26 at 4–5.

Silva chose self-representation and the court appointed Anthony M. Goldstein as standby counsel. ECF No. 9-3 at 17.  Silva filed a "Pro-Per Motion for Appeal to Suppress illegally obtained Evidence" seized from the Tahiti Village Resort. ECF No. 20-6 at 2, 14.  The State filed no opposition, and the motion was denied. ECF No. 9-21.  Silva later filed a "Motion to Challenge Admissibility of Illegally Obtained Evidence." ECF No. 20-7 at 3.  The State filed an opposition, and the court denied the motion in a minute order finding Silva "does not have standing." ECF Nos. 9-3 at 29; 28-17 at 2.  Silva did not renew his motions to suppress at trial.  The jury heard testimony concerning the Tahiti Village Resort's investigation, the hotel staff's eviction efforts, police entry, Silva's arrest, the search warrant, and seizure of evidence. *See* text, *supra*, at 3–6.  Silva chose not to testify at trial. ECF Nos. 9-27 at 169–172; 9-31 at 82.  In closing arguments, the prosecutor urged the jury to return guilty verdicts on all counts except count 9 (possession of credit card or debit card without cardholder's consent at the Tahiti Village Resort) as admittedly unproved, and the jury returned guilty verdicts for all counts except count 9.[18] ECF Nos. 9-3 at 34–35; 9-28 at 111; 9-32 at 30–31.

The trial court adjudged Silva a large habitual criminal and sentenced him to concurrent life terms on each count, except for one consecutive sentence, with minimum parole eligibility after ten years. ECF Nos. 9-3 at 43–44; 9-47 at 10–11.

Silva's appellate counsel raised no claims on direct appeal involving the motions to suppress evidence, and the convictions were affirmed. ECF No. 9-63.  Silva sought habeas corpus relief claiming, among other things, that appellate counsel performed deficiently by failing to assert the trial court erred in denying his motion to suppress evidence seized from the Tahiti Village Resort.  The state district court denied Silva's claims. ECF No. 9-81 at 8–10.  The state appellate courts affirmed based upon Silva's failure to provide an adequate record. ECF Nos. 9-86; 9-88.  Silva timely filed the instant second amended petition. ECF No. 19.

////

---

[18] Counts 8 and 10 concerned the Tahiti Village Resort. ECF No. 9-26 at 4–5.

*Discussion*

A.  Standard of review

The Nevada Court of Appeals rejected the corresponding claim on the basis that "Silva's failure to provide this court with an adequate record precludes our review." ECF No. 9-86 at 3. The court could not "conclude the district court erred in denying this claim without first conducting an evidentiary hearing;" and affirmed the judgment of the district court denying the claim. ECF No. 9-86 at 3.  The respondents acknowledged in their answer that "the Nevada Court of Appeals did not reach the merits of Silva's claim regarding his appellate counsel's failure to raise the trial court's denial of his motion to suppress . . . ." ECF No. 43 at 15.

Accordingly, my review of the claim is *de novo*, rather than deferential review under AEDPA,[19] subject to any presumption of correctness attached to any state district court factual findings under 28 U.S.C. § 2254(e)(1). *See, e.g., Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002) ("when it is clear that a state court has not reached the merits of a properly raised issues, we must review it de novo").[20]

---

[19] The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be *granted with respect to any claim that was adjudicated on the merits* in State court proceedings unless the adjudication of the claim –
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

[20] I have a nonwaivable obligation to independently determine the correct standard of review. *Amado v. Gonzalez*, 785 F.3d 1119, 1133 n.9 (9th Cir. 2014).  The respondents' concession that the "Nevada Court of Appeals did not reach the merits" of this claim informs my review of the standard-of-review issue under the party presentation principle. *See, e.g., United*

B.  General legal principles

Although federal courts may not consider a Fourth Amendment claim on federal habeas review, federal courts may consider a Sixth Amendment claim that counsel was ineffective for failing to competently raise a meritorious Fourth Amendment claim in criminal proceedings by filing a suppression motion or other means. *Kimmelman v. Morrison,* 477 U.S. 365, 383 (1986).

For his claims of ineffective assistance of appellate counsel, Silva must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).  He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice.  On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his perspective at the time. *Id*. at 689–90.  The court starts with a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. *Id*.  On the prejudice prong, Silva must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694.

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap. *Bailey v. Newland*, 263 F.3d 1022, 1028–29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Effective appellate advocacy requires weeding out weaker issues with less likelihood of success. *Id*.  The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the appellant for the same reason – because the omitted issue has little or no likelihood of success on appeal. *Id*.

The Fourth Amendment generally requires police officers obtain a warrant before searching or seizing "persons, houses, papers, and effects." U.S. Const. amend. IV.  The Fourth Amendment's protection applies to hotel rooms. *Stoner v. State of California*, 376 U.S. 483, 490

---

*States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).  The conclusion I reach on *de novo* review would likewise lead to a denial of relief under AEDPA's deferential standard of review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

(1964) ("[A] guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.") (citations omitted).  The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether (1) the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place" and (2) their expectation of privacy is "one that society is prepared to recognize as 'reasonable.' " *Minnesota v. Olson,* 495 U.S. 91, 95–6 (1990) (internal citations omitted) (citing *Rakas v. Illinois,* 439 U.S. 128, 143–144, n.12 (1978).

    C.  Analysis

Silva claims his appellate counsel rendered ineffective assistance by failing to challenge the trial court's denial of his motion to suppress evidence seized from the Tahiti Village Resort. ECF No. 19 at 18–23.  I hold Silva was not denied effective assistance of appellate counsel because his Fourth Amendment claim had no likelihood of success on appeal, and counsel's performance was neither deficient nor prejudicial.

First, Silva lacked standing to raise a Fourth Amendment challenge to the hotel room search because he disavowed occupancy of the room under oath.  Silva filed two declarations, signed under the penalty of perjury, in support of his motions to suppress evidence, in which he asserted that before the resort's entry, he told the resort manager he was "no longer staying at the hotel" and at the time he filed the motion to suppress, he told the court the room police searched "was not the room that Mr. Siliva had stayed at."  Because Siliva admitted he had no reasonable expectation of privacy in the hotel room, a Fourth Amendment suppression claim was meritless and appellate counsel's failure to challenge the denial of the motion to suppress evidence was objectively reasonable and did not constitute deficient performance.

Second, Silva did not possess a reasonable expectation of privacy in the hotel room given his stated purpose and reason for his presence inside the room.  "An individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location." *Minnesota v. Carter,* 525 U.S. 83, 90 (1998) (citations omitted).  In *Carter*, the Supreme Court of the United States held the subjects of warrantless surveillance had no

reasonable expectation of privacy in an apartment rented by another person where they (1) were in the apartment for a short time; (2) were there solely to conduct a commercial transaction (to divide a quantity of cocaine into bags); and (3) had no previous connection or relationship with the lessee. *Id.* at 90.  Under *Carter*, even taking into account Silva's claim that he was present in the hotel room to inquire who occupied it (as set forth in his declarations in support of his motions to suppress), Silva failed to show he had a legitimate and reasonable expectation of privacy in the room because (1) his presence was brief (less than an hour); (2) it was commercial in the sense that he told the manager he was going to the room to allegedly determine who used his (Meek's) information to register the room; and (3) he told the manager he did not know who occupied the room.  On these facts, Silva had no reasonable expectation of privacy in the hotel room and no standing for a motion to suppress evidence.  As such, his appellate counsel did not render deficient performance in failing to raise a claim that the trial court erred in denying the motion to suppress for lack of standing.

Finally, even if Silva had standing, any reasonable expectation of privacy was extinguished when the resort took back the room before police entered it.  The Ninth Circuit has held that "even if the occupant of a hotel room has procured that room by fraud, the occupant's protected Fourth Amendment expectation of privacy is not finally extinguished until the hotel takes 'affirmative steps to repossess the room.'" *United States v. Cunag*, 386 F.3d 888, 895 (9th Cir. 2004) (citing *United States v. Dorais*, 241 F.3d 1124, 1128 (9th Cir. 2001) (holding "mere expiration of the rental period, in the absence of affirmative acts of repossession by the lessor, does not automatically end a lessee's expectations of privacy") and *United States v. Bautista*, 362 F.3d 584, 586 (9th Cir. 2004) (holding a hotel patron had Fourth Amendment protection "in the face of an *unconfirmed* report that a stolen credit card number was used to reserve the room" because the hotel had not taken affirmative steps toward repossessing the room before police searched the room).

In *Cunag*, the defendant registered a hotel room under a false name and paid for it using a deceased woman's credit card and forged documents purporting to authorize his use of her card.

*Cunag*, 386 F.3d at 889–90. The hotel manager learned the bank would not honor the charges, locked the room, and called police. *Id*. at 890. Police accompanied the manager to the room where the manager knocked on the door but received no answer. *Id*. at 890. The manager again knocked, and Cunag opened the door. *Id.* at 890. Smoke emanated from the room as the manager told Cunag they needed to discuss the bill. *Id*. at 892. One officer, fearing a fire, stepped forward as Cunag tried to close the door. *Id.* Police removed and handcuffed Cunag and two other occupants for safety reasons. *Id*. While searching for a fire inside the room, the officers saw stolen mail in plain view. *Id*. at 890, 892. The district court denied a motion to suppress finding Cunag had no "subjective belief that he should have any reasonable expectation of privacy because he knew full well the only reason he was in the that room was because he got in there by fraud." *Id*. at 893. The Ninth Circuit affirmed but clarified Cunag's expectation of privacy was only extinguished by the hotel's "affirmative steps to repossess the room" before police searched it. *Id*. at 895 (*citing Dorais*, 241 F.3d at 1129). The Circuit concluded the hotel's affirmative steps included (1) confirming Cunag procured occupancy by fraud and deceit; (2) (attempting) to lock out the occupants; and (3) registering a crime report with the police. *Id*.

According to Silva, the resort manager, Mayhew, contacted him about the credit card problem, but Silva told him he did not occupy the room and professed ignorance about its occupants. Thus, the resort staff faced the unknown when they took the following steps to repossess the room before police entered to assist in evicting Silva and the other occupants: (1) confirmed the bank would not pay the room charges because they were fraudulent; (2) alerted the room registrant, Meeks (who was actually Silva) and confirmed he did not occupy the room despite his registration; (3) called police to report the crime; (4) told police their intention was to evict whoever was inside the room and asked police to standby for safety reasons; (5) knocked and announced their presence outside the door but received no response; (6) used three master keys before successfully opening the room door; (7) unlocked the door and entered the room believing no one was inside; and (8) encountered four individuals on the balcony and asked police for assist in removing them. Even assuming Silva had a reasonable expectation of privacy

14

earlier, it was extinguished as early as Mayhew's phone telephone call alerting Silva about the credit card problem, and as late as the resort staff unlocking and opening the hotel room door.

A claim that the trial court erred in denying the motion to suppress lacked merit and appellate counsel did not render deficient performance in choosing to omit a challenge to the trial court's ruling in Silva's direct appeal.[21] Accordingly, Ground 2 does not provide a basis for federal habeas relief.

*Conclusion*

Silva was not denied effective assistance of appellate counsel because the omitted Fourth Amendment claim had no likelihood of success on direct appeal. On the record that would have been presented on direct appeal, Silva had neither standing to raise a Fourth Amendment challenge to the search of the hotel room nor a reasonable expectation of privacy in the room at the relevant time. Given that these are threshold requirements for the suppression of evidence under the Fourth Amendment, I need not reach any remaining issues raised by the parties for Ground 2.

---

[21] Silva's reliance on *United States v. Young*, 573 F.3d 711 (9th Cir. 2009) is misplaced. ECF No. 19 at 21. In *Young*, the hotel was unaware the room was procured through fraud and therefore took no affirmative steps to evict Young (or anyone else) from the room for nonpayment. *Id*. at 715. The hotel instead "temporarily" locked Young out of his room after investigating whether Young took items from another guest's room and discovering a firearm inside Young's backpack in his room. *Id*. at 719. The hotel's policy prohibited firearms inside rooms, but the hotel did not evict guests for possession of firearms; rather, it offered guests storage outside the rooms. *Id*. at 716–717. In affirming the order suppressing evidence found inside Young's hotel room, the court noted "the only affirmative act the hotel took toward eviction was the temporary lock on his room," which did not necessarily signal to Young that he had been evicted as opposed to having a key that did not work. *Id*. at 716–717. The court noted police took an unlawful short-cut by choosing to illegally search Young's hotel room for evidence of a crime (even though the hotel told police a firearm was located inside defendant's backpack inside the room) rather than seek a warrant to search the room. *Id*. at 722.

Here, according to Silva's declarations, the hotel manager told him there was a problem with the credit card payment and Silva responded by disavowing occupancy. And, according to the testimony of the resort manager, hotel security officers, and police, the resort took numerous steps to take back the hotel room before police entered the room. *See* text, *supra*, 3–6.

I THEREFORE ORDER that the sole remaining ground, Ground 2, is denied with prejudice on the merits. The petition as amended (ECF No. 19) is dismissed with prejudice.

I FURTHER ORDER that a certificate of appealability is denied. Jurists of reason would not find it debatable whether I was correct in my procedural ruling dismissing Ground 1 as untimely, for the reasons stated in ECF No. 40. For the reasons discussed above, reasonable jurists would not find my assessment of Ground 2 debatable or wrong.

The Clerk shall enter a final judgment and close this case.

Dated: July 21, 2021.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE